UNITED BONDING INSURANCE COMPANY, Third-Party Plaintiff-Appellant,

v.

CATALYTIC CONSTRUCTION COMPANY, Third-Party Defendant-Appellee.

No. 74–1490.

United States Court of Appeals, Ninth Circuit.

March 29, 1976.

Bernard L. Balkin (argued), Kansas City, Mo., for appellant.

Paul Blankenstein (argued), of Dept. of Justice, Washington, D. C., for appellee.

OPINION

Before WALLACE, TRASK, and KENNEDY, Circuit Judges.

ANTHONY M. KENNEDY, Circuit Judge:

The Assignment of Claims Act, 31 U.S.C. § 203, 41 U.S.C. § 15, provides that "[a]ll

transfers and assignments . . . of any claim upon the United States" are void unless made in compliance with procedures specified in the Act. We hold that a claim against the cost-plus government contractor in this case is not a claim against the United States within the meaning of the Act. In addition, we hold that a person is not always privileged to continue paying a contractor prior to "legal completion" of the contract, when he knows of the rights of an equitable subrogee. For these reasons, we reverse the judgment of the district court.

The Atomic Energy Commission hired Catalytic Construction Company (CATCO) to provide construction management services, on a cost-plus basis, at the Nevada Nuclear Rocket Development Station. CATCO then contracted with Miranti Construction Company for a number of specific projects at the Station. United Bonding Insurance Company was surety under performance and payment bonds for these contracts. The bonding agreement provided that in the event of Miranti's default, its rights to payments under the construction contracts were assigned to United Bonding.

On October 9, 1967, Miranti notified United Bonding of financial difficulties in paying workmen and suppliers. United Bonding thereupon took control of the CATCO-Miranti contracts, advancing money for payrolls and other expenses, and ensured that all of the contracts were fully performed.

United Bonding called CATCO on the same date to request withholding of payments to Miranti, but there is an unresolved factual controversy as to when CATCO received effective notice of the bond company's rights. On instructions from the AEC and the United States Attorney, CATCO continued to make progress payments under its contracts with Miranti. Between October 9 and November 1, CATCO paid approximately $39,000 to Miranti and $7,000 to a bank assignee of Miranti, retaining only $3,000. After November 1 CATCO stopped making payments under the Miranti contracts and, upon receiving written authorization from Miranti on December 1, began paying these sums to United Bonding.

This litigation began with a number of claims by subcontractors or suppliers against Miranti and United Bonding (as surety on the payment bonds) brought under the Miller Act, 40 U.S.C. § 270b. These were all settled. What remained were seventeen third-party claims by United Bonding against CATCO for wrongful payment or retention of sums under the CATCO-Miranti contracts between October 9 and November 1, 1967. The bond company claimed these sums as Miranti's assignee or, alternatively, as an equitable subrogee. These claims were tried in September 1972. In December 1973 the district court entered judgment for United Bonding on only one of its claims, in the amount of $2,430.22, on the basis of a scholarly and comprehensive opinion. United Bonding appeals to this court from the judgment against it on the other claims. No appeal was taken from the judgment against CATCO.

## I. APPLICABILITY OF THE ASSIGNMENT OF CLAIMS ACT

 United Bonding's claims were primarily based on Miranti's assignment of payments due from CATCO under the construction contracts. Under this theory, CATCO could only be liable for payments made after it had notice of the assignment, and at trial there was a sharp controversy over the timing and adequacy of the notice given CATCO. The district court avoided resolving the factual dispute by holding that the assignment by Miranti was void under the Assignment of Claims Act. On this point, we disagree with the district court's analysis.

The district court determined that the Miller Act would apply to the contracts in question,[1] and therefore concluded that the

---

1. The Miller Act has been held to cover contracts for AEC projects, even though made with a construction manager rather than the AEC itself. *United States ex rel. West Pac. Sales Co. v. Harder Indus. Contractors,* 225 F.Supp. 699, 701–02 (D.Ore.1963); *see Fidelity*

Assignment of Claims Act was also applicable. However, there are important differences in the language and purpose of these two statutes, and we do not believe they can be given a parallel construction.

The Miller Act is applicable to any project for a "public building or public work," whether or not the government is a party to the construction contract. 40 U.S.C. § 270a; *United States ex rel. Gamerston & Green Lumber Co. v. Phoenix Assurance Co.,* 163 F.Supp. 713, 715, 717–18 (N.D. Cal.1958); *see United States ex rel. Sherman v. Carter,* 353 U.S. 210, 216, 77 S.Ct. 793, 796, 1 L.Ed.2d 776, 782 (1957); *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.,* 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163, 1167 (1944). The purpose of the Miller Act is to protect those who would have materialmen's and workmen's liens under state law if they were not working on a structure exempt as a federal public work or building. The Miller Act has thus been liberally constructed in light of its legislative history, to protect laborers and suppliers. *See* cases cited *supra.*

By contrast, the statutory test for applying the Assignment of Claims Act is whether a "claim upon the United States" is involved. This language would appear to limit the coverage of the statute to contracts in which the government is a party. Indeed, it would be contrary to the current interpretation of that Act to give it an unnecessarily broad construction. For example, although it purports to make assignments in contravention of its provisions "null and void," we have held that the Act protects the government only and cannot be asserted as between assignor and assignee.[2]

It is true that in this case the government has promised to indemnify CATCO for any liability assessed; therefore, extending to CATCO the protection of the Assignment of Claims Act would benefit the government. Such a rationale would sweep too widely, however. Even government-controlled corporations have been held not entitled to the protection of this Act.[3] Thus it would be inappropriate to extend that protection to private companies under contract with the government.

The district court also based its conclusion on a determination that CATCO was acting as an agent of the United States.[4] Certainly the United States must act through agents when it enters into con-

---

& Deposit Co. v. Harris, 360 F.2d 402, 407–08 (9th Cir. 1966) (NASA project held covered).

**2.** *In re Freeman,* 489 F.2d 431, 432–33 (9th Cir. 1973); *Danning v. Mintz,* 367 F.2d 304, 306 (9th Cir. 1966), cert. denied, 386 U.S. 990, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967). One court stated categorically: "The Anti-Assignment Act is for the government's protection and only the United States may assert it." *United States v. Certain Space in Syracuse, N.Y.,* 320 F.Supp. 491, 496 (N.D.N.Y.1969), aff'd on opinion below, 435 F.2d 872 (2d Cir. 1970), cert. denied, 402 U.S. 908, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971).

**3.** The Assignment of Claims Act was held not to apply to claims against the United States Shipping Board Emergency Fleet Corporation. *Providence Eng'r Corp. v. Downey Shipbldg. Corp.,* 3 F.2d 154, 155 (E.D.N.Y.1924). This case was distinguished by a court applying the Act to the Federal Housing Administration, on the ground that the FHA was merely an administrative agency of the United States and had no separate corporate personality. *Federal Ins. Co. v. Hardy,* 222 F.Supp. 68, 71–72 (E.D.Mo. 1963).

**4.** As a matter of agency law, the status of CATCO would be a close question. The fact that it is a cost-plus contractor is not dispositive, particularly since it does risk bearing some costs attributable to mismanagement or unreasonableness. There is dictum in a Miller Act case that an AEC construction manager was a "supervisory agent" rather than a "prime contractor." *United States ex rel. West Pac. Sales Co. v. Harder Indus. Contractors,* 225 F.Supp. 699, 702 (D.Ore.1963). On the other hand, the Supreme Court indicated in a tax immunity case that a "servant" in agency terms would qualify for the federal government's exemption, thus implying that the AEC service contractors there were not agents of the United States. *United States v. Boyd,* 378 U.S. 39, 46–48, 84 S.Ct. 1518, 1523–1524, 12 L.Ed.2d 713, 719–720 (1964). *See also E. I. du Pont de Nemours & Co. v. Lyles & Lang Constr. Co.,* 219 F.2d 328, 332 (4th Cir.), cert. denied, 349 U.S. 956, 75 S.Ct. 884, 99 L.Ed.2d 1280 (1955) (treating AEC management contractor as "independent contractor" not "agent of the government" in denying motion of the United States to intervene as a party).

tracts, and a properly authorized agent could enter into an agreement which would create a claim against the United States. But the contracts in this case were made in the name of CATCO, not the government. If the United States wants the protection of the Assignment of Claims Act, it can be sure of getting it by contracting in its own name. Otherwise, the contract does not create a claim enforceable directly against the United States and thus is not covered by the Act.

One other circuit has considered a case similar to this one. There the court held that a cost-plus government contractor, operating under the close direction of government officials, was not entitled to assert the Assignment of Claims Act:

> [The Act] has no application to transactions between private individuals. A claim against the United States under this section is a right to demand money or property from the United States which can be presented by the claimant to some department or officer of the United States, or may be prosecuted in the court of claims.

*Rosecrans v. William S. Lozier, Inc.,* 142 F.2d 118, 124 (8th Cir. 1944) (citations omitted). We conclude this is the proper standard and hold the Assignment of Claims Act inapplicable to the contracts in the instant case.[5]

---

**5.** Although the standard would seem to be similar, we do not rely on cases refusing to extend the immunity of the federal government from state taxation to AEC management contractors. *United States v. Boyd,* 378 U.S. 39, 46, 84 S.Ct. 1518, 1523, 12 L.Ed.2d 713, 719 (1964); *United States v. Township of Muskegon,* 355 U.S. 484, 486–87, 78 S.Ct. 483, 485, 2 L.Ed.2d 436, 438 (1958); *Alabama v. King & Boozer,* 314 U.S. 1, 8–9, 62 S.Ct. 43, 45, 86 L.Ed. 3, 5–6 (1941). *See also Foster v. Day & Zimmermann, Inc.,* 502 F.2d 867, 873–75 (8th Cir. 1974) (intergovernmental immunity does not extend to a contractor even if the government indemnifies its losses).

**6.** As a transfer by operation of law, this equitable subrogation right is not subject to the Assignment of Claims Act. *United States v. Aetna Cas. & Sur. Co.,* 338 U.S. 366, 373–76, 70 S.Ct. 207, 212–213, 94 L.Ed. 171, 181, 182 (1949). In priority, this right relates back to

## II. EQUITABLE SUBROGATION THEORY

The secondary basis for recovery asserted by United Bonding was its equitable right of subrogation for disbursements made pursuant to its duties under the performance and payment bonds. *See Pearlman v. Reliable Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). As the district court acknowledged, United Bonding acquired an equitable right to payments due Miranti under the contracts, to the extent of its net costs.[6]

It is agreed that this equitable right is potentially applicable only to five of the contracts at issue in this case. Under these contracts, Miranti was to receive a total of about $32,800 during the critical October 9 to November 1 time period. CATCO retained $2,430.22 of the total due, and the district court awarded a judgment in this amount to United Bonding.[7] CATCO paid out the remainder to Miranti and an assignee bank. At the time, United Bonding recovered $5,430 of the payments directly from Miranti. United Bonding now seeks the remaining $25,000 on the theory that CATCO wrongfully disbursed this money.

United Bonding's equitable right is not contested on this appeal; if CATCO had not paid out the contract balances then the

---

the time of the surety's original contract to provide the performance bonds.

**7.** The district court refused to order prejudgment interest on this sum on the ground that CATCO was acting as the government's agent. The traditional rule is that interest on claims against the United States cannot be awarded except if authorized by statute or contract, unless the claim is made directly under the fifth amendment. *United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *United States v. Mescalero Apache Tribe,* 518 F.2d 1309, 1316–21 (Ct.Cl.1975); *see* 28 U.S.C. § 2516(a) (codifying traditional rule in court of claims procedure). However, for reasons similar to those stated in Part I of this opinion, we do not regard the instant case as involving a claim against the United States. Thus the district court was wrong to deny prejudgment interest on this basis.

bond company would have an undisputed right to all the money retained. This right relates back in time to the bonding agreement and has priority over the rights of the contractor or an assignee. *National Shawmut Bank v. New Amsterdam Casualty Co.,* 411 F.2d 843, 848–49 (1st Cir. 1969). The question remains, however, whether CATCO is liable for having paid someone other than United Bonding after receiving notice of the bond company's rights.

■ If these contracts had been fully performed by the time the payments came due, then CATCO would have been a stakeholder faced with the conflicting claims of Miranti (and its assignee bank) and United Bonding. Payment to the contractor would not discharge liability if the surety subsequently established a right to the funds. *American Fidelity Fire Insurance Co. v. United States,* 513 F.2d 1375, 1379 (Ct.Cl. 1975); *Home Indemnity Co. v. United States,* 376 F.2d 890, 893–94, 180 Ct.Cl. 173 (1967).

■ On the other hand, CATCO would not have been a stakeholder if the contracts were still in progress. The interest in obtaining timely completion of the contracts could give CATCO a legitimate reason for continuing progress payments to the contractor. In such a case the contracting party has discretion to continue paying the contractor and is liable to the surety only for an abuse of that discretion. The contracting party must balance its "interests in proceeding with the contract, against possible harm to the surety" in deciding whether to continue payments. *United States Fidel-*

*ity & Guaranty Co. v. United States,* 475 F.2d 1377, 1384–85, 201 Ct.Cl. 1 (1973); *accord, Argonaut Insurance Co. v. United States,* 434 F.2d 1362, 1368–69, 193 Ct.Cl. 483 (1970); *Fireman's Fund Insurance Co. v. United States,* 362 F.Supp. 842, 845–46 (D.Kan.1973).

### The "Final Payment"

The district court found CATCO to be a stakeholder as to one of the contracts, in which it made a "final payment" after the project had been actually completed. However, the court found that this payment of $1,663.80 to Miranti was subsequently turned over to United Bonding, and thus denied the bond company a double recovery. The evidence that this money was turned over to United Bonding was purely circumstantial; however, we cannot say that the district court's finding was clearly erroneous.

### The Three "Progress Payments"

■ Pursuant to three other contracts there were "progress payments" which raise a more serious question.[8] The court concluded that these projects were not physically completed as of the dates payments were made. It indicated that its conclusion was based on a stipulation by United Bonding which denominated some later payments made by CATCO as "progress payments". However, this inference is by no means unambiguous.[9] Moreover, the same document relied upon by the district court to establish that one contract was actually completed before payment was made shows also that the three contracts

---

8. On October 17, CATCO made a progress payment to Miranti of $7,921.15 on subcontract 5069–1.

On October 25, CATCO made a progress payment to Miranti of $10,560.00 on subcontract 3139–1.

On November 1, CATCO made a progress payment to Miranti's bank assignee of $7,369.69 on subcontract 3105–8.

9. The stipulation shows the following subsequent payments to United Bonding:

As to subcontract 5069–1, one further "final payment" of $1,434.88;

As to subcontract 3139–1, one further "progress payment" of $43.28 (and retention of $6.72);

As to subcontract 3105–8, three further "progress payments" totalling $11,298.13 (and retention and union payments totalling $1,189.23).

A comparison with the amounts of contested payments listed in note 8 *supra* indicates that the district court's inference is supported only as to subcontract 3105–8. In the other two contracts, subsequent payments were either insignificant or denominated a "final payment"; both contracts could well have been physically completed prior to the contested payments.

here in question were actually completed on or before the dates of the contested payments.[10] In any event, the labeling of a payment as a "progress payment" cannot be dispositive of whether the contracts in question were completed. *See Great American Insurance Co. v. United States,* 492 F.2d 821, 825, 202 Ct.Cl. 523 (1974).

It is possible the district court based its conclusion on a finding that the three contracts in question were not legally completed as of the date CATCO made the disbursements in question. However, a contracting party is not always privileged to prefer the contractor to an equitable subrogee prior to legal completion of the contract. The question is whether CATCO had a good reason to overlook the bond company's subrogation rights to the payments. This requires a balancing of the interests at stake, and CATCO is liable if it abused its discretion in continuing to pay Miranti. We are satisfied that once a construction project is physically completed, continued payment to the contractor instead of the subrogee is unlikely to be justified.[11]

Whether or not CATCO's continued payments were improper also depends on the extent of its knowledge of Miranti's financial difficulties and of the bond company's rights. This is not a black-and-white question: the degree of notice must be balanced against the extent of CATCO's interest in continuing its payments to the contractor. Where a construction project is physically completed or virtually so, the interest in continuing to receive performance is not likely to be substantial; thus a relatively summary notice to CATCO would be sufficient to make it liable to the

bond company for subsequent wrongful disbursements.

## CONCLUSION

For the reasons stated in Part I of this opinion we conclude that Miranti's assignment to United Bonding of its contract rights against CATCO was not within the proscription of the Assignment of Claims Act. On remand, the district court must determine which, if any, of the contract payments were made after CATCO received notice that the assignment to United Bonding was effective.

Although the bond company may not obtain a double recovery under its equitable subrogation theory, we reviewed the district court's judgment in this respect as well. Because of variations in the tests for effectiveness of notice, the district court on remand may once again be compelled to reach this secondary theory. For the reasons stated in Part II of this opinion, we do not believe CATCO's justification for continuing payments to Miranti can be considered independently of the question of notice. If the district court finds it necessary to reach this issue on remand, it must evaluate CATCO's actions in light of the seriousness of its interest in obtaining continuing performance from Miranti and the extent of its knowledge of United Bonding's equitable interest.

**REVERSED AND REMANDED.**

---

10. The exhibit was from CATCO's own records and showed the following "actual completion date[s]":
 Subcontract 5069–1, September 8;
 Subcontract 3139–1, September 19;
 Subcontract 3105–8, November 1.

11. The converse of this statement is not always true; it may well constitute an abuse of discretion to continue paying a contractor even when a project is not physically complete. In such a case, the contracting party is required to consider both the importance of continued performance of the contract and the nature of the contractor's default. However, simple notice of a contractor's financial difficulty in paying laborers and materialmen does not require withholding payments when performance is proceeding on schedule. *Fireman's Fund Ins. Co. v. United States,* 362 F.Supp. 842, 846 (D.Kan.1973).